# CIRCUIT COURT OF THE CITY OF CHESAPEAKE

Phillip D. Webb

v.

Louis Hansen
and Virginian-Pilot
Media Co., L.L.C.

Case No. (Civil) CL10-2933

By Judge Randall D. Smith

December 2, 2011

This matter is before the Court on Defendants' Demurrer to Plaintiff's Second Amended Complaint. The Court has considered Defendants' Demurrer, Defendants' Brief in Support of Demurrer, Plaintiff's Motion to Overrule Demurrer, Plaintiff's Brief in Support of its motion, and the arguments of counsel. The Court is now prepared to rule on the matter.

## I. *Introduction*

This suit arises from an article written by Louis Hansen and published in the *Virginian-Pilot* regarding Plaintiff's minor son's criminal indictment, sentencing, and the circumstances both leading up to and following those proceedings. Plaintiff alleges the article falsely implies that Plaintiff engaged in unethical conduct by obtaining preferential treatment for his son and that the article falsely implied that Plaintiff had been questioned about allegations of unethical behavior but had declined to comment to conceal his own wrongdoing. Plaintiff concedes that the article does not contain any express statements about Plaintiff that are false, but argues these implications are defamatory and, therefore, actionable.

Defendants' Demurrer argues that Plaintiff has failed to state a cause of action on two separate grounds. First, Plaintiff alleges that, although the article contains no false statements about him, it defames Plaintiff

by implying that Plaintiff engaged in unethical conduct by obtaining preferential treatment for his son and by reporting that Plaintiff declined to comment, which implies he had been questioned regarding his ethics and "had something to hide." The Demurrer argues the article is incapable of creating either implication as a matter of law. Additionally, Defendant argues the Second Amended Complaint fails to state a cause of action to the extent it relies on anonymous Internet user comments in violation of the Communications Decency Act of 1996, 47 U.S.C. § 230.

## II. *Standard of Review*

"A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." *Glazebrook v. Board of Supervisors of Spotsylvania County*, 266 Va. 550, 554, 587 S.E.2d 589, 591 (2003). Further, a demurrer "admits the truth of the facts contained in the pleading to which it is addressed, as well as any facts that may be reasonably and fairly implied and inferred from those allegations. A demurrer does not, however, admit the correctness of the pleader's conclusions of law." *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 317, 626 S.E.2d 428, 429 (2006); *Harris v. Kreutzer*, 271 Va. 188, 195, 624 S.E.2d 24, 28 (2006).

To survive a challenge by demurrer, a "pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment'." *Eagle Harbor, L.L.C. v. Isle of Wight County*, 271 Va. 603, 611, 268 S.E.2d 298, 302 (2006) (quoting *Moore v. Jefferson Hospital, Inc.*, 208 Va. 438, 440, 158 S.E.2d 124, 126 (1967)). Rule 1:4(d) of the Rules of the Supreme Court of Virginia states: "Every pleading shall state the facts on which the party relies in numbered paragraphs, and it shall be sufficient if it clearly informs the opposite party of the true nature of the claim or defense."

A trial court is "not permitted on demurrer to evaluate and decide the merits of the allegations set forth in a [Complaint], but only may determine whether the factual allegations of the [Complaint] are sufficient to state a cause of action." *Harris*, 271 Va. at 195-96, 624 S.E.2d at 24 (quoting *Riverview Farm Assocs. Va. Gen. P'ship v. Board of Supervisors*, 259 Va. 419, 427, 528 S.E.2d 99, 103 (2000)); *accord Almy v. Grisham*, 273 Va. 68, 76, 639 S.E.2d 182, 186 (2007) ("[A] demurrer presents an issue of law, not an issue of fact.").

Virginia Code § 8.01-273 states, in part: "All demurrers shall be in writing and shall state specifically the grounds on which the demurrant concludes that the pleading is insufficient at law. No grounds other than those stated specifically in the demurrer shall be considered by the court."

III. *Analysis*

A. *Defamation by Implication*

Virginia recognizes that defamation may be made by inference, implication, or insinuation. *Carwile v. Richmond Newspapers*, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1954). "In determining whether the words or statements complained of . . . are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Id.* at 8. "However, the meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation." *Id.* Courts should consider the statements "as other people would understand them, and according to the sense in which they appear to have been used." *Id.* at 7, 82 S.E.2d at 591-92. As stated in *Chapin v. Greve*, "The dispositive question . . . is whether or not a reasonable factfinder could conclude that the article or statements in the article state or imply, in their plain and natural sense, the defamatory meanings ascribed to them by the plaintiffs in their complaint." 787 F. Supp. 557, 564 (E.D. Va. 1992).

Plaintiff analogizes the present case to the circumstances in *Carwile*, where the defendant newspaper published a statement that the Virginia State Bar has the power to disbar any attorney for violations of the ethical code. The article discussed the "complete vindication" of police officials following an investigation prompted by an attorney's repeated public accusations that the police department was corrupt. *Carwile*, 196 Va. at 3, 82 S.E.2d at 589. The Supreme Court of Virginia held that:

> [I]t is a reasonable implication of this language, read in connection with the whole article, that the plaintiff is guilty of unethical and unprofessional conduct for his charges made against the Police Department; for which conduct the defendant suggests in a veiled but pointed way that the plaintiff could and should be subjected to disbarment proceedings. . . . While the defamatory language does not in express terms charge the plaintiff with a breach of his professional honor, yet, when aided by the innuendo, operating within the scope of its legitimate functions, it does impute conduct tending to injure him in his profession.

*Id.* at 9, 82 S.E.2d at 592. According to Plaintiff, the reference in Defendants' article to the State Board of Education's authority to suspend students charged with crimes likewise imputes Plaintiff's reputation as an assistant principal by the implication that Plaintiff played a role in preventing his

son's suspension from school and that there was some investigation or "case" regarding Plaintiff's involvement with his son's punishment.

Defendant argues that the article does not state or suggest that Plaintiff played a role in preventing his son from being suspended from school nor does it suggest that there was any investigation of the Plaintiff regarding the school's treatment of his son. In order to reach Plaintiff's reading of the article, the Court first must infer from the article that Plaintiff's son was not punished due to some inappropriate action taken by Plaintiff, second ,that Plaintiff is unfit for his position as a school official because of this alleged inappropriate action, and, third, that Plaintiff's refusal to comment on his son's criminal case implies that Plaintiff is under investigation himself. According to Defendant, this improperly "piles one inference upon the other." *See Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 635-36 (E.D. Va. 2009), *aff'd*, 630 F.3d 338 (4th Cir. 2010). Furthermore, Defendant argues that any implication that arises from the article "arises from the facts themselves, not any manipulation or omission in the article." .

Defendant also argues that, even if there is an implication of wrongdoing on Plaintiff's part that arises from the article, it is not defamatory because there is no "law, rule, or principle" that prohibits parents from "asking for leniency for their minor child."

The Court finds that the statements in the article, read in connection with the entire article and in the light most favorable to Plaintiff, are reasonably capable of implying that Plaintiff's son avoided suspension from school due to some action taken by the Plaintiff or Plaintiff's influence as an administrator in the school district. The article characterizes the high school student convicted of assaulting a classmate as the son of "an assistant principal at Oscar Smith High School" twice on the first page of the story, in the sidebar immediately preceding the article and again in the forth sentence. The article states that Plaintiff previously coached a future Olympic medalist at the same school his son attended and that both of Plaintiff's sons involved in the criminal incident were "pole vaulting stars" at the high school. The article makes two juxtapositions further insinuating Plaintiff's son received preferential treatment. The first pairs a statement that Plaintiff's son would be allowed to remain at the high school with a statement that the school division "offered to let [the victimized student] finish his final year at another high school." The article concludes with another juxtaposition of the effect this incident has had on the young men's futures, the victimized student did not return to high school and hopes to join a shipyard apprenticeship, while Plaintiff's son received a track scholarship to a state university and the son's attorney opines that he has "a bright future ahead of him," in the final lines of the article. Finally, like the article in *Carwile*, Defendants' article discusses the sanctions that could have been imposed on Plaintiff's son as a result of his criminal behavior. These statements and the fair inferences arising therefrom are capable of a

defamatory meaning, and the Demurrer is overruled as to the implication that Plaintiff obtained preferential treatment for his son.

The Demurrer is sustained as to Plaintiff's allegation that the article's statement that Plaintiff "declined to comment about the case" creates a defamatory implication that Plaintiff is under investigation for engaging in unethical conduct. Taking the words "as other people would understand them and according to the sense in which they appear to have been used," *Carwile*, 196 Va. at 7, 82 S.E.2d at 591-92, this language does not have the defamatory meaning that Plaintiff alleges. It is common for individuals to decline to comment to the press, and Plaintiff extends the meaning of "the case" beyond its ordinary reach by alleging it suggests there is an investigation or case against Plaintiff himself. The entire article describes a criminal case against Plaintiff's son, and "the case" plainly refers to that criminal matter.

## B. *Communications Decency Act*

The Communications Decency Act of 1996 (47 U.S.C. § 230) protects an entity providing an online forum for information exchange from being "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. 230(b)(1). As the Fourth Circuit has noted, "By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998); *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 252 (4th Cir. 2009).

Plaintiff argues that his suit is not based upon the online reader comments, but on the content of the article written and published by Defendants. Plaintiff claims the reader comments in Paragraph 3a of his Complaint are evidence of damages and are not submitted for purposes of liability.

Defendants assert that Plaintiff's use of Internet comments to establish damages in his claim of liability violates the Act by holding Defendants responsible for the content of messages posted by anonymous Internet commentators.

The Court agrees with Defendants, and the Demurrer is sustained as to the extent that Plaintiff relies on Internet user comments to establish damages for the defamation claim. Plaintiff must be able to prove each element of his claim without relying on the Internet comments.

## IV. *Conclusion*

The rulings of this Court are as follows, in short sum: (1) Demurrer is overruled as to the implication that Plaintiff obtained preferential treatment

for his son; (2) Demurrer is sustained as to allegation that Plaintiff's refusal to comment creates a defamatory implication; and (3) Demurrer is sustained as to the extent that Plaintiff relies on internet user comments to establish his damages.

August 6, 2012

This matter is before the Court on post-trial motions filed by Defendant and the Court's ruling on Defendant's motion to strike made at the conclusion of Plaintiff's case in chief and renewed at the conclusion of all of the evidence. The Court took the motions to strike under advisement at that time, and the case was submitted to the jury. The jury returned a verdict in favor of Plaintiff in the amount of $3,000,000.00 compensatory damages.

The Court has reviewed the memoranda of counsel, Defendant's Bench Brief Regarding the Law on Defamation by Implication and Actual Malice, Plaintiff's Brief in Opposition to Defendant's Bench Brief Regarding the Law on Defamation by Implication and Actual Malice, Defendant's Bench Brief Regarding Whether a Claim of Preferential Treatment is a Matter of Opinion, Plaintiff's Brief in Opposition to Defendant's Bench Brief Regarding Whether a Claim of Preferential Treatment is a Matter of Opinion, Defendant's Brief in Support of Motion for a New Trial on All Issues, Remittitur, and/or a New Trial on Damages, Plaintiff's Response to Defendant's Brief in Support of Motion for a New Trial on All Issues, Remittitur, and/or a New Trial on Damages, Defendant's Brief in Support of Motion to Strike, and Plaintiff's Brief in Response to Defendant's Motion to Strike. The Court heard further oral argument from the parties on July 26, 2012, regarding these motions. The Court now stands ready to rule.

The written briefs and oral arguments of the parties clearly state their respective positions and arguments and, for the sake of brevity, will not be repeated here. As to Defendant's argument concerning defamation by implication and the requirement that Defendant intend the defamatory implication, this Court believes that, in Virginia, defamation by implication was recognized in *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588 (1954). It has not been determined by our Supreme Court that a defendant must intend the implication. For purposes of this analysis, I will side with Plaintiff and hold Plaintiff may benefit from the circumstantial inference that everyone intends the results of their voluntary acts.

First in order of occurrence is Defendant's Motion to Strike. Because a ruling on this issue is dispositive of this case, it is unnecessary to consider Defendant's post-trial motions.

Plaintiff's evidence did not establish actual malice by clear and convincing evidence.

*Standard of Review*

When ruling on a motion to strike a plaintiff's evidence, a trial court "is required to accept as true all evidence favorable to a plaintiff and any reasonable inferences that may be drawn from such evidence." *James v. City of Falls Church*, 280 Va. 31, 38, 694 S.E.2d 568, 572 (2010) (citing *Austin v. Shoney's, Inc.*, 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997)). "The trial court is not to judge the weight and credibility of the evidence and may not reject any inference from the evidence favorable to the plaintiff unless it would defy logic and common sense." *Austin*, 254 Va. at 138, 486 S.E.2d at 287.

Plaintiff argues that the evidence establishes *New York Times* malice by clear and convincing evidence and that Defendant both knew his implication was false and that he acted with reckless disregard as to whether it was false or not.

*Actual Knowledge of Falsity*

Plaintiff claims evidence to support knowledge of falsity derives first from Hansen's testimony that, when he wrote the article, he was aware that it was not possible for an assistant principal at Oscar Smith High School to influence discipline at Great Bridge High School. Plaintiff argues that this establishes that Hansen passed off as true that which he knew to be untrue: "He thus published a falsity 'with knowledge that it was false'." (Pl.'s Br. Resp. Mot. Strike 7.) Second, Plaintiff argues Hansen admitted he had no information that Plaintiff had sought preferential treatment for his son when he wrote the article. Third, Plaintiff says both Hansen and Tom Cupitt (school spokesperson) testified that Hansen was told by Cupitt that Kevin Webb did not receive preferential because of his father's position. Fourth, "although the article was structured to imply the receipt of preferential treatment, Cupitt's denial of the implication is stated in the article, making the article self-proving evidence of knowledge of falsity." (Pl.'s Br. Resp. Mot. Strike 7.)

Because of the Court's ruling that Plaintiff is a public official, his burden is to prove by clear and convincing evidence that Defendant made the defamatory statements with actual malice, that is, with knowledge that they were false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 726 (1964). This standard is required to protect the rights of the public and the press to engage in uninhibited debate concerning public issues.

It is undisputed and Plaintiff concedes that the factual statements are true. He believes that it is the implication which is defamatory.

In a light construed most favorably to Plaintiff, the evidence shows that Hansen discovered no facts of preferential treatment given to Kevin Webb

or Plaintiff seeking the same on behalf of his son. Contrary to Defendant's claims, the article, while stating true facts, implies that, although the school states that no preferential treatment was given, Kevin Webb, the student found guilty of assaulting the father of a special education student and who also bullied that student at school and who also happened to be the son of an assistant principal in the school system, was allowed to remain in school, compete in sports, receive an athletic scholarship, and go on to college while the victimized student had to leave school and obtain a GED. It implies that a great injustice took place and invites the reader to question the justness of the result. A fair inference could be that, because Kevin Webb's father is an assistant principal, he received preferential treatment. For purposes of the Court's analysis, I will assume that one of these inferences by a reader is that Plaintiff himself obtained the preferential treatment for his son.

The question here is the breadth of the phrase "Defendant knowing the statements to be false." Hansen testified that he did not write the article with the intent to imply more than what the article stated; however, I will assume the jury did not believe him. At most a reasonable trier of fact could conclude that, despite being told and discovering no evidence of preferential treatment, the outcome of the incident was so disparate for Patrick Bristol and Kevin Webb; therefore, something wrong or inappropriate must have occurred to produce such a result. Stated another way: is the "knowing the statement to be false" standard met where the defendant writes truthful statements, but implies that, even though this is the result of the reporter's interviews and research, something must surely be wrong because the result is not one that would be expected given the facts? Viewed in the light most favorable to Plaintiff, I find that it is not.

It is undisputed that Hansen did not omit any truthful information he was given during his investigation for the article. Plaintiff refused to be interviewed by Hansen, and members of the school administration testified that they did not and would not disclose the Chesapeake school system's policy that explained the disparate result in the treatment of Kevin Webb and the other student absent a subpoena, which Hansen could not have obtained.

There is no contest that Hansen was told by Cupitt that no preferential treatment was given and that Hansen accurately quoted Cupitt in the article. The only possible inference from these facts viewed in the light most favorable to Plaintiff is that Hansen disbelieved the "official reason" and invites the reader to also question the truthfulness of the school administration. This does not satisfy the requirement that Hansen knew the implication to be false. It may reach the negligence standard for a reporter to imply or provoke without knowing more, or because he could not learn more, but Plaintiff does not establish knowing falsity under *New York Times*.

*Reckless Disregard of Truth or Falsity*

Plaintiff argues Hansen's threat to Plaintiff to write a one-sided story if Plaintiff refused to comment on the article and Hansen's email to a colleague at the newspaper ending in the phrase "I love the smell of napalm in the morning," is direct evidence of intent to consciously disregard the truth. A media defendant in a defamation action subject to the *New York Times* actual malice standard cannot be found liable because of its failure to investigate the accuracy of any allegedly defamatory statement unless that defendant has a "high degree of awareness of probable falsity." *Jackson v. Hartig*, 274 Va. 219, 229-30, 645 S.E.2d 303, 309 (2007) (citing *Shenandoah Publ'g House, Inc. v. Gunter*, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993)). Reckless conduct is not measured by a "reasonably prudent man" standard. There must exist some evidence from which a trier of fact could reasonably conclude that Defendant in fact entertained serious doubts as to the truth of its publication. *Jackson*, 274 Va. at 228, 645 S.E.2d at 308. This is governed by a subjective standard. *Id.*

The evidence is fatally void of any facts to support the premise that Hansen ever entertained serious doubts about what he wrote or implied. This requisite is necessary under First Amendment analysis to insure that the media will endeavor to report and publish about matters of public affairs. "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S. Ct. 1323, 1326 (1968).

Concerning the email Hansen sent to a colleague, evidence that Hansen had ill will toward Plaintiff is, without more, insufficient to establish knowledge of falsity or reckless disregard for the truth. *See Jackson*, 274 Va. at 231, 645 S.E.2d at 310 (involving newspaper making similar statement about public official) (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666, 668, 109 S. Ct. 2678 (1989)).

The Court, therefore, finds Plaintiff has not established actual or constitutional malice by clear and convincing evidence, and will sustain Defendant's Motion to Strike. This ruling being dispositive, the Court need not address other motions filed.